IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| CARL A. RAGASA,<br><br><br>Plaintiff,<br><br><br>vs.<br><br><br>COUNTY OF KAUA'I; ROBERT F. WESTERMAN; KALANI VIERRA; NORMAN HUNTER; JOHN DOES 1-50; JANE DOES 1-50; DOE ASSOCIATIONS 1-50; DOE PARTNERSHIPS 1-50; DOE CORPORATIONS 1-50; AND DOE GOVERNMENTAL AGENCIES 1-50,<br><br><br>Defendants. | CIVIL NO. 14-00309 DKW-BMK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART: (1) ROBERT F. WESTERMAN'S, IN HIS INDIVIDUAL CAPACITY, MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]; (2) KALANI VIERRA'S, IN HIS INDIVIDUAL CAPACITY, MOTION FOR SUMMARY JUDGMENT [DKT. NO. 108]; (3) NORMAN HUNTER'S, IN HIS INDIVIDUAL CAPACITY, MOTION FOR SUMMARY JUDGMENT [DKT. NO. 112]; (4) COUNTY OF KAUAI'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 115]; AND (5) CARL A. RAGASA'S FRCP 12(B)(6) MOTION TO DISMISS NORMAN HUNTER'S COUNTERCLAIM FILED OCTOBER 12, 2015 [DKT. NO. 118]** |

**ORDER GRANTING IN PART AND DENYING IN PART: (1) ROBERT F. WESTERMAN'S, IN HIS INDIVIDUAL CAPACITY, MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]; (2) KALANI VIERRA'S, IN HIS INDIVIDUAL CAPACITY, MOTION FOR SUMMARY JUDGMENT [DKT. NO. 108]; (3) NORMAN HUNTER'S, IN HIS INDIVIDUAL CAPACITY, MOTION FOR SUMMARY JUDGMENT [DKT. NO. 112]; (4) COUNTY OF KAUAI'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 115]; AND (5) CARL A. RAGASA'S FRCP 12(B)(6) MOTION TO DISMISS NORMAN HUNTER'S COUNTERCLAIM FILED OCTOBER 12, 2015 [DKT. NO. 118]**

**INTRODUCTION**

Plaintiff Carl Ragasa alleges that the County of Kauai Fire Department ("KFD") and KFD supervisors, Robert F. Westerman, Kalani Vierra, and Norman Hunter, retaliated against him after he reported improper conduct by fellow KFD employees that included gas theft, on-duty drug use, and the falsification of time sheets. Because issues of fact persist with respect to Ragasa's 42 U.S.C. § 1983 First Amendment retaliation claim against the individually named Defendants (Count I), as well as his Hawaii Whistleblowers Protection Act, Haw. Rev. Stat. ("HRS") § 378-62 claim against the County (Count III), the motions for summary judgment are DENIED as to those claims. The motions are GRANTED with respect to the Section 1983 municipal liability claim against the County (Count II), and the intentional infliction of emotional distress claim against the individually named Defendants (Count IV). Finally, the motions are GRANTED IN PART

2

with respect to the *respondeat superior* liability claim against the County (Count V).

Ragasa's motion to dismiss Hunter's Counterclaim is GRANTED as to Counts I and II and DENIED as to the remaining Counts.

## BACKGROUND

### I.   Factual Background

#### A.   KFD Organizational Procedures

Ragasa is employed by KFD as a Water Safety Officer ("WSO") in the Ocean Safety Bureau ("OSB"), the agency encompassing the County's lifeguard program. He has worked for the County for over 23 years. Ragasa does not have supervisory responsibilities, and his duty is to patrol the beaches, keep the public safe from any dangers they encounter in the water, and rescue swimmers in need. *See* Ragasa Decl. ¶ 2.

This matter involves alleged retaliation by several of Ragasa's supervisors by means of informal and formal discipline. Defendant Vierra is a KFD Ocean Safety Director, and Hunter is a KFD Water Safety Officer Supervisor. Both supervise Ragasa. Westerman is the Chief of the KFD, in charge of the entire department, including Ragasa and his supervisors. While other supervisors may discipline subordinates, disciplinary actions that are more severe than a written

reprimand, such as suspensions or terminations, must be formally approved by Westerman or the KFD Deputy Chief.  Declaration of Robert Westerman in Support of County Motion ("Off. Cap. Westerman Decl.") at ¶ 2 [Dkt. No. 116].

Complaints relating to workplace issues filed by non-exempt or non-management employees, such as Ragasa, are governed by a process subject to a Collective Bargaining Agreement ("CBA").  Generally, as Chief, Westerman does not initiate a formal investigation unless a complaint is submitted in writing. Disciplinary action imposed by Westerman based upon employee misconduct can be challenged by filing a "Step I" grievance form, followed by a "Step II" hearing pursuant to the CBA's grievance process.  The employee may attend the Step II hearing with a union representative and provide evidence challenging the disciplinary action, after which Westerman can confirm or alter the disciplinary action.  Off. Cap. Westerman Decl. ¶¶ 3-4.  If the employee is dissatisfied with the Step II decision, he or she may challenge the decision at a "Step III" grievance hearing administered by the County Department of Human Resources ("DHR"), which may alter the disciplinary action or overturn it entirely.  Under this configuration, the KFD Chief does not have the ultimate authority to impose workplace discipline on non-exempt and non-management KFD employees—that authority resides with DHR.  Off. Cap. Westerman Decl. ¶ 5.  Even Step III

decisions maybe challenged via arbitration.  *See e.g.* Westerman Ex. 41 (8/7/15 Arbitration Decision).

**B.  Ragasa's 2010 Report to Hunter**

Ragasa has a history of workplace disputes with KFD administration.  The incidents relevant to the instant case began in March 2010 when Ragasa reported to Hunter having observed another KFD employee stealing gas from the County.  Vierra Ex. 1 (8/19/2015 Ragasa Dep. Tr.) at 28-33.  Ragasa claims that this employee was both Vierra's friend and partner in an unrelated business.  8/19/2015 Ragasa Dep. Tr. at 43-50.  According to Ragasa, Hunter said he would take care of it and pass the information up the chain of command.  Ragasa Decl. ¶ 10.  In fact, Hunter confirmed that he relayed Ragasa's report to his supervisor, Vierra, who told him that he would investigate.  7/29/15 Hunter Dep. Tr. at 42.  According to Vierra, he then, in turn, relayed Ragasa's report to Westerman, and Westerman told Vierra to have Hunter interview the employee whom Ragasa had accused of stealing the gas.  8/18/15 Vierra Dep. Tr. at 40-41.  Hunter reported back to Vierra that the employee denied any gas theft, and no written report was made regarding the matter.  8/18/15 Vierra Dep. Tr. at 41.

During the time period he reported the alleged gas theft, and unbeknownst to Ragasa, a County-wide audit of gas dispensing practices was underway.  As a

result of this private audit, changes were made to the process of fueling County

vehicles and special keys and gas cards were issued to personnel.  8/18/15 Vierra

Dep. Tr. at 175; 7/29/15 Hunter Dep. Tr. at 46; 7/30/15 Westerman Dep. Tr. at 47-

48, 178-180.

On March 25, 2010, approximately a week after reporting the gas theft to

Hunter, Ragasa asserts that Hunter arrived at the Anahola lifeguard tower where

Ragasa was stationed and yelled at him about the cleanliness of a County truck

there.  Ragasa Decl. ¶ 12.  Three weeks later, Hunter filed a "KFD Form 103

Report" and a "KFD Form 110 – Violence in the Workplace Report" based on the

March 25, 2010 incident.  In his April 13 and 14, 2010 reports, Hunter claims that

when he tried to speak privately with Ragasa, Ragasa "made a stance that I

recognized as a martial arts stance," and told Hunter to "beat it."  Ragasa Ex. 11

(4/13/10 and 4/14/10 Hunter KFD Form 103), attached to CSOF in Opposition to

Hunter Motion [Dkt. No. 126].  Hunter claims Ragasa raised his voice and waved

his arms, "threatening to bring down the lifeguard program and Fire Dept." Ragasa

Ex. 12 (4/13/10 Hunter KFD Form 110), attached to CSOF in Opposition to Hunter

Motion [Dkt. No. 126].  Hunter submitted these reports to Vierra, who forwarded

them to Westerman, who instructed Vierra to investigate.  8/18/15 Vierra Dep. Tr.

at 90-91.  According to Ragasa and Vierra, the parties worked it out in person

during a conversation at the Anahola tower.[1]  The three (Hunter, Vierra and Ragasa) agreed to work on better communication and keeping KFD equipment in good condition, and ended their discussion by shaking hands.  Ragasa Decl. ¶ 13; 8/18/15 Vierra Dep. Tr. at 91-92.  Vierra then informed Westerman of the results of the investigation and meeting.  8/18/15 Vierra Dep. Tr. at 91-92.

### C.  2012 Report of Employee Drug Use

In early 2012, Ragasa reported to Hunter that another WSO was smoking marijuana on duty in the Anahola lifeguard tower.  Declaration of Norman Hunter in Support of Individual Capacity Motion ("Ind. Cap. Hunter Decl.") ¶ 19 [Dkt. No. 113]; 8/19/15 Ragasa Dep. Tr. at 60-61.  According to Ragasa, Hunter's response was that he would speak to the employee, and Ragasa believes that the employee was transferred to a different lifeguard tower following his report to Hunter, because he never worked with that employee again.  8/19/15 Ragasa Dep. Tr. at 69, 171-72.  Ragasa believes that the employee that was allegedly smoking marijuana was a friend of Hunter.  8/19/15 Ragasa Dep. Tr. at 193.  Hunter states that following Ragasa's report, he spoke with the accused employee, who denied

---

[1]Notwithstanding this informal resolution, Ragasa claims that he did not raise his voice during his March 25, 2010 meeting with Hunter, did not take a martial arts stance or act aggressively, and did not make derogatory remarks about Hunter or the KFD.  Ragasa Decl. ¶ 12.

smoking marijuana in the lifeguard tower.  Ind. Cap. Hunter Decl. ¶¶ 20-21.

According to Hunter, because there was no other witness or evidence of drug use

by the employee, "there was nothing else for [him] to investigate."  He conveyed

both Ragasa's complaint and his own inquiry to Vierra, his immediate supervisor,

who concurred with both Hunter's actions and conclusions.  Ind. Cap. Hunter Decl.

¶¶ 22-23; *see also* 7/29/15 Hunter Dep. Tr. at 52-53.

### D.   October 26, 2012 Training Incident and Investigation

On October 26, 2012, Ragasa attended a mandatory OSB Workplace

Violence training program conducted by WSO Gerald Hurd.  Ragasa was not in

uniform and left the training session before it ended.  Hurd filed a written

complaint, and a KFD Form 110—Violence in the Workplace Report after Ragasa

walked out of the training.  *See* Westerman Ex. 1 (10/26/12 Complaint) and Ex. 2

(Hurd KFD 110), attached to CSOF in Support of Westerman Motion [Dkt. No.

106].  According to Hurd, Ragasa was upset that the training consisted of watching

a DVD presentation, and told Hurd to "bring him the DVD to his tower and he

could watch it there."  Westerman Ex. 1 (10/26/12 Complaint).  Ragasa also called

Hurd and the KFD administration "clowns."  Westerman Ex. 1 (10/26/12

Complaint) and Ex. 2 (Hurd KFD 110).

Westerman assigned Vierra to conduct an investigation of Hurd's complaint, directing him to speak to the personnel in attendance at the training session before reporting back.  8/18/15 Vierra Dep. Tr. at 70.

### E.     October 29, 2012 Report to Vierra, Investigation, and Discipline

On October 29, 2012, Ragasa called Vierra by telephone to find out why Vierra was investigating him.  8/18/15 Vierra Dep. Tr. at 71.  Vierra told Ragasa he was assigned to investigate the October 26, 2012 workplace violence training incident with Hurd, and asked Ragasa why he left the training session early.  *Id.* According to Vierra, Ragasa first responded that he left because the air conditioning was making him feel sick.  Vierra then asked him why he was out of uniform, and Ragasa did not respond.  *Id.*  When Vierra asked why Ragasa reported to his lifeguard tower after leaving the training if he felt sick, Ragasa told him that the sunlight makes him feel better.  *Id.*

According to Vierra, Ragasa then told him that "the guys in the tower don't respect me," mentioned "something about time sheet forgery" at the workplace violence training session, and that he had videotapes of Vierra stealing County gas. 8/18/15 Vierra Dep. Tr. at 72.  Vierra asked Ragasa if he could see the videotapes, and Ragasa hung up on him.  *Id.*  Vierra felt threatened by Ragasa, so he filled out a KFD Form 110—Violence in the Workplace Report, and reported the matter to

Westerman in person.  *Id.*  Vierra's Form 110 states, "He verbally harassed me by telling me that I am greedy and that no one respect[s] me.  Also told me that I gave myself a raise and I don't care [about] the guys on the line.  His verbal tone was intimidating and anger."  Westerman Ex. 3 (10/31/12 Vierra Form 110).  Westerman pulled Vierra off of the investigation, and appointed another KFD officer to investigate Hurd and Vierra's workplace violence reports.  8/18/15 Vierra Dep. Tr. at 78-79, 174.

On November 5, 2012, Westerman prepared a letter to Ragasa informing him that he would be placed on leave with pay effective November 6, 2012, pending investigation of the two workplace violence complaints filed against him.  Westerman Ex. 4 (11/5/12 Letter).  The November 5, 2012 letter instructed Ragasa to contact Westerman or Battalion Chief Russell Yee if he had any questions.  *Id.*  Westerman followed up in a November 26, 2012 letter, informing Ragasa that—

> the Department is conducting investigations into allegations regarding workplace violence and violations of Department policy and the Ocean Safety Bureau Standard Operating Guidelines.  It has been alleged that you committed the act of workplace violence at the mandatory training on October 26, 2012 and also when you spoke to the Ocean Safety Supervisor on the phone [] regarding the investigation.  It has also been alleged that you have evicted fellow Ocean Safety personnel from the Anahola tower and intimidated or attempted to intimidate tower personnel and supervisors.

> In order to complete those investigations, the interview we have scheduled for you on Friday, November 30, 2012 at 9:00 a.m. will also cover those allegations and afford you the opportunity to provide us with your account of those incidents. The interview will be conducted by Battalion Chief Yee.

Westerman Ex. 5 (11/26/12 Letter).

Ragasa completed and signed a written questionnaire on November 30, 2012 during his interview with Battalion Chief Yee, acknowledging that he left the October 26, 2012 training early, but said that it was because he was feeling sick. Westerman Ex. 5 (11/30/12 Questionnaire). Yee completed a summary of his investigation on December 9, 2012. Westerman Ex. 7 (12/9/12 Summary of Investigation).

On December 17, 2012, Ragasa was issued five Notices of Disciplinary Action ("NDA") arising from the October 26 and October 29, 2012 incidents. *See* Westerman Exs. 8-12. Three of the NDAs related to the October 26, 2012 training: (1) "name calling and overt gestures . . . calling the supervisor and administration clowns," resulting in a suspension of ten days, *see* Westerman Ex. 8; (2) attending training "wearing a Bud Light logo shirt and red non-uniform shirt," resulting in a written reprimand, *see* Westerman Ex. 9; and (3) "abruptly left training session without permission," resulting in a one-day suspension, *see* Westerman Ex. 10. The remaining NDAs related to the October 29, 2012 telephone call to Vierra,

which resulted in a ten-day suspension for "threaten[ing] Supervisor with exposure of supposed criminal acts," *see* Westerman Ex. 11; and another ten-day suspension for intimidating other lifeguards at the Anahola tower, *see* Westerman Ex. 12.

Westerman notified Ragasa in a letter dated January 14, 2013, that the NDA relating to the Anahola tower had been amended and clarified to reflect the dates of the underlying conduct:

> During the period of 2010 through the present, employee has made unreasonable demands without valid reason and used intimidation to dictate who will or will not work at the Anahola Tower, or when an individual could work at that tower, to both his regular supervisor, temporary supervisors, and fellow workers.
>
> These incidents were brought to the attention of Fire Administration in February 2012.

Westerman Ex. 13.

On January 7, 2013, pursuant to the CBA, Ragasa filed Step I grievances relating to the December 17, 2012 NDAs.  Westerman Exs. 15-18.  A Step II grievance proceeding was held on April 30, 2013, and in a May 10, 2013 letter, Westerman responded to Ragasa's union agent that he was upholding the disciplinary actions taken, with the exception of the ten-day suspension for the portion of the October 26, 2012 incident involving threats to fellow employees. Westerman Ex. 23 (5/10/13 Letter) at 2.  As to that portion, Westerman agreed "to

reduce the punishment to a verbal warning about threatening and intimidating other employees." *Id.* Ragasa's one-day suspension for abruptly leaving the October 26, 2012 training session without permission was also reduced to a written reprimand. *Id.* at 1. Ragasa did not appeal those portions of the disciplinary actions any further. *See* Westerman Ex. 41 (8/7/15 Arbitration Decision) at 6.

Ragasa challenged the remaining portions of the December 17, 2012 NDAs relating to the October 26, 2012 training incident through the CBA's Step III grievance and arbitration processes. At the Step III stage, the County DHR reduced Ragasa's ten-day suspension for name-calling, gesturing, and leaving early to a three-day suspension, and upheld the written reprimand for the uniform violation. *See* Westerman Ex. 33 (9/19/13 Step III Grievance Decision Re: Uniform Policy) (written reprimand affirmed); Westerman Ex. 37 (10/16/13 Step III Grievance Decision Re: Name Calling and Walking Out) (ten-day suspension reduced to three days). In the portion of the consolidated arbitration relating to the October 26, 2012 incident, the Arbitrator dismissed Ragasa's grievance because the discipline was with "proper cause," and found that the County did not violate the CBA when it imposed a suspension without pay of three work days for the name calling and overt gestures, and a written reprimand for the violation of the

13

uniform policy at the October 26, 2012 training session.  Westerman Ex. 41 (8/7/15 Arbitration Decision) at 65.

Ragasa successfully grieved the December 17, 2012 NDA relating to the October 29, 2012 telephone call to Vierra, which had resulted in a ten-day suspension for "threaten[ing] Supervisor with exposure of supposed criminal acts," *see* Westerman Ex. 11.  The ten-day suspension was rescinded by the County DHR following an August 7, 2013 Step III hearing.  *See* Westerman Ex. 34 (9/20/13 Step III Decision).

### F.    January 24, 2013 Call to Hunter, Investigation, and Discipline

On January 24, 2013, Ragasa telephoned Hunter to find out when he would be able to return to work.  According to Ragasa, "Hunter started venting about other things with his job.  He told me the County is corrupt.  He told me he was being attacked by upper management and would get fired or demoted if he didn't write up the guys at Anahola Tower.  Hunter also complained about all the cover-ups by the County."  Ragasa Decl. ¶ 40.

According to WSO Myles Emura, he had a telephone conversation with Hunter on January 24, 2013, sometime after Hunter's call with Ragasa—

> During this conversation, Hunter also confirmed he was aware there was a cover-up of: fuel theft by Kalani Vierra, falsification of timesheets for "favored officers; and unfair distribution of overtime for these "favored" WSOs.  Hunter also

14

> stated he would write a 103 with all of the criminal, unethical
> violations that he knew about, observed and heard about and
> that he would give this document to Ragasa.

Declaration of Myles Emura ("Emura Decl.") ¶ 6. Emura avers that "Hunter admitted to me that KFD administration was out to get Carl Ragasa and that they were willing to falsify documents to achieve their goal of getting him out." Emura Decl. ¶ 7.

Hunter filled out a KFD Form 103 a couple of days after his conversation with Ragasa and gave it to Westerman. The January 27, 2013 KFD Form 103 relates that Ragasa was unhappy with his suspension. According to Hunter, Ragasa asked him "if during him (Carl) reporting gas theft a couple of years ago if I knew about it. I said yes I reported it. We followed protocol and my supervisors did [their] investigations. He then said again, so I did know of the investigation, I said yes and it was reported." Ragasa Ex. 16 (1/27/13 Hunter KFD Form 103), attached to CSOF in Opposition to Hunter Motion [Dkt. No. 126]. Hunter's January 27, 2013 KFD Form 103 states—

> Carl then raised his voice and said you are being taped. And he
> has letters to prove that I will get fired for [it]. Then in his next
> breath told me that if I wrote a 103 telling of his lawyers
> intentions to waiver my wrongs. For the letter stating that I
> knew everything that the county was aware that gas was being
> stolen. I feel I am being Blackmailed by this individual.

*Id.* at 1.  Hunter understood Ragasa to be raising "issues that the county was covering up," and leveling accusations that Hunter knew "of all the wrongs that the administration is doing."  7/29/15 Hunter Dep. Tr. at 72.

On January 28, 2013, Ragasa's co-worker, WSO Kleve Zarbaugh, also submitted a KFD Form 103 addressed to Westerman and Vierra, which states in part—

> I feel that I've been slandered by Carl Ragasa and thrown in the mix of some sort of blackmail attempt.  I was told by my supervisor Norm Hunter that Carl had some letters about Norm and myself and Carl wanted Norm to write a 103 for him, or else he would turn in the letters which could supposedly jeopardize my job.

Ragasa Ex. 18 (1/28/13 Zarbaugh KFD Form 103), attached to CSOF in Opposition to Hunter Motion [Dkt. No. 126].

Westerman notified Ragasa by letter dated January 29, 2013 that he was again being placed on leave pending investigation because—

> while out on a previous suspension for hostile and inappropriate behavior in the workplace, it is believed that you have been going to the county lifeguard towers and intimidating water safety personnel, essentially threatening to blackmail these employees to force them to submit to your demands otherwise you will be filing complaints against them and/or including their names in allegations and/or complaints you are threatening to make.  As such, your behavior is deemed detrimental to conducting a proper investigation of these claims and to the operations of the workplace.

16

Westerman Ex. 19 (1/29/13 Letter).

Westerman assigned Battalion Chief Shawn Hosaka to conduct an investigation into the incident, and Hosaka submitted his report to Westerman on February 25, 2013.  *See* Westerman Ex. 20 (2/25/13 Report).  Hosaka interviewed Ragasa, Hunter, and WSOs Eric Pereza, Kleve Zarbaugh, and Jeff McIntosh.  *Id.*  The investigation report notes that, on January 22, 2013, Ragasa told Pereza that "he was going after F-1 and Mr. Kalani Vierra," and Pereza "was uncomfortable about being dragged into this situation about taking gas just because he (Mr. Pereza) was stationed at the tower at the time."  Westerman Ex. 20 (2/25/13 Report) at 3.

Hunter told Hosaka on February 12, 2013 that Ragasa called him on January 24, 2013, seeking a letter from Hunter "to Mr. Ragasa's lawyer claim[ing] that F-1, Kalani Vierra and the Deputy Chief all knew about gas theft along with other issues that the Administration all knew about."  Westerman Ex. 20 (2/25/13 Report) at 4.  Hosaka interviewed Ragasa on February 23, 2013, with his union representative present.  Hosaka requested that the interview not be recorded, and Ragasa agreed.  Westerman Ex. 20 (2/25/13 Report) at 4.  Ragasa told Hosaka that he visited the Anahola tower twice during January 2013, and acknowledged asking WSO Kai Wedemeyer to "write a 103" and to "write the truth about everything to

do with what's going on."  Westerman Ex. 20 (2/25/13 Report) at 4.  Ragasa also

spoke to WSOs Chad Medeiros and Kaipo Jacquias by telephone, and they

indicated that they would "write 103's/statements for him to help out."  Westerman

Ex. 20 (2/25/13 Report) at 5.  Ragasa told Hosaka during the February 23, 2013

interview that Hunter told him during their January 24, 2013 phone call "about all

the criminal action [] not being reported and that [Deputy Chief] Blalock said

Hunter would be demoted if he doesn't write up some guys, all false stuff."

Westerman Ex. 20 (2/25/13 Report) at 5.

Ragasa claims that he "never coerced, attempted to coerce, intimidated or

blackmailed any of my co-workers or supervisors to make statements on my

behalf."  Ragasa Decl. ¶ 37.  Notwithstanding these assertions, Hosaka's report to

Westerman concluded, "that workplace violence in the form of intimidation and

coercion was committed by Ragasa in order to deflect the focus away from him."

Westerman Ex. 20 (2/25/13 Report) at 1.

Westerman notified Ragasa in an April 3, 2013 letter that the investigation

had been completed, and based upon his review, Westerman found that "there was

an attempt on [Ragasa's] part to coerce and threaten a fellow employee and a

supervisor in order to benefit a case in which you may or may not be preparing."

Westerman Ex. 21 (4/3/2013 Letter).  Westerman noted that, Ragasa had

previously been disciplined for disruptive and threatening behavior, and that "this offense is part of an ongoing issue with you at the workplace." *Id.* Enclosed with the letter was an NDA signed on April 3, 2013, which included a suspension of thirty days, covered by the leave of absence without pay pending investigation for the period January 20, 2013 through February 28, 2013. The "reason for discipline" stated on the NDA was—

> Employee committed the act of intimidation and coercion toward a fellow employee and a supervisor by threatening inclusion in a lawsuit or other actions if they did not write a Form 103 about incidents that may or may not have taken place at work. This behavior was perceived by the fellow employee and supervisor as threatening and possible blackmail.

Westerman Ex. 21 (4/3/2013 NDA).

On May 9, 2013, pursuant to the CBA, Ragasa filed a Step I grievance relating to the April 3, 2013 NDA. Westerman Ex. 22. A Step II hearing was held in July 2013 before Deputy Chief Blalock, who concluded that "the level of discipline imposed in this instance was both appropriate and warranted." Westerman Ex. 24 (7/23/2013 Step II Grievance Decision). The County DHR held a Step III hearing on November 1, 2013. Westerman Ex. 39 (1/13/2014 Step III Grievance Decision). The January 13, 2014 Step III Grievance Decision found that Ragasa "has been disrupting operations and taking the focus away from what needs to get done in the workplace," and agreed that disciplinary action was

19

warranted, but reduced the suspension from thirty to seven days.  *Id.*  In the consolidated Arbitration Decision, Ragasa's seven-day suspension was rescinded and ordered removed and expunged from his personnel file.  Westerman Ex. 41 (8/7/15 Arbitration Decision) at 66.

### G.   July 9, 10, and 13, 2013 Incidents, Investigation, and Discipline

On July 9, 2013, Ragasa left his post at the Anahola tower during lunch time without permission.  When Hunter saw Ragasa driving in his personal vehicle at lunch time, he went to the Anahola tower and confirmed that Ragasa had left his station without first checking out over the radio.  7/29/15 Hunter Dep. Tr. at 110-112.  Hunter filled out a KFD Form 103 to document Ragasa's absence.  *Id.*; *see also* Westerman Ex. 41 (8/7/15 Arbitration Decision) at 51 (quoting Hunter KFD Form 103).  Ragasa acknowledges leaving for lunch without permission, but contends that the practice was widespread and that other WSOs were not punished for leaving their posts without checking out.  He claims that "Hunter did not require guards to radio or call him before leaving.  Hunter previously stated to me and other guards that as long as somebody cover or got coverage, somebody can run and get lunch."  Ragasa Decl. ¶ 47.

On July 10 and 13, 2013, the County contends that Ragasa closed and departed the Anahola tower early, before the public beach closure time, leaving the

beach unattended.  *See* Westerman Exs. 25-28. Hunter submitted a KFD Form 103

to Westerman, dated July 10, 2013, which states—

> Carl Ragasa has been leaving tower early with emergency truck
> and not checking out.  Called Anahola truck to ask what time he
> checked out.  (No response) then called tower.  No Response, I
> then call Chad [Medeiros'] personal phone.  No answer.  At 5
> pm got a call from Chad, then I asked, what time Carl and him
> closed tower.  Chad said 4:25 pm and he needed to leave cause
> he felt unsafe by himself.  I gave another warning about
> checking out and leaving early.  I then called dispatch to let
> them know that no checkout at Anahola tower so it is on tape.

Ragasa Ex. 23 (Hunter 7/10/13 KFD Form 103); *see also* Ragasa Ex. 24 (7/10/13

Dispatch Recording), attached to CSOF in Opposition to Hunter Motion [Dkt. No.

126].

Vierra and Westerman subsequently received emails sent to the County

Mayor's office by Elizabeth Gonzalez—who is Hunter's wife—and Denise Love,

complaining that the Anahola tower closed early on July 13.  8/18/15 Vierra Dep.

Tr. at 150-155.  According to Hunter, he did not discuss the matter with his wife

and was not aware that she had emailed a complaint regarding the early closure to

the Mayor's office until he was notified of the fact by Vierra and Westerman.[2]

7/29/15 Hunter Dep. Tr. at. 144-45

According to Ragasa, he did not leave Anahola tower early on either July 10 or July 13, 2013.[3]  He claims that, on July 10, 2013, after shutting down the tower, he patrolled the beach one final time before returning the County truck to base, a practice that usually takes 5 to 10 minutes.  Ragasa Decl. ¶¶ 50-52.  Ragasa avers that, prior to July 2013, "Hunter never spoke to me or warned me about complaints that I was closing the tower early, nor did he speak to me or warn me that I was not supposed to leave at lunch and/or that I must call in first."  Ragasa Decl. ¶ 65.  He also contends that, before "July 2013, many WSO's closed their towers a few

---

[2]Vierra and Westerman did not learn that Gonzalez was Hunter's wife or that Love was a co-worker of Gonzalez until sometime in mid-2015.  *See* Westerman Ex. 41 (8/7/15 Arbitration Decision) at 59-61; Ragasa Ex. 10 (5/19/15 Arb. Tr.) at 707, attached to CSOF in Opposition to Vierra Motion [Dkt. No. 128].

[3]At his deposition, however, Ragasa appeared to acknowledge leaving the tower early in the following colloquy:

> Q.   But it's your position that you shouldn't have been disciplined because everyone's doing the same thing and they're not getting busted right?
>
> A.   Yes.
>
> Q.   And the same thing with the July incidents, you admit going to lunch without calling out, you admit to leaving the tower early, but again, that's common practice, you're saying you shouldn't have been disciplined for that, correct?
>
> A.   Yes.

8/19/15 Ragasa Dep. Tr. at 102-03.

minutes early and did not routinely check out via radio from their towers when they closed their towers.  I can hear if and when the WSO's radio dispatch over the radio."  Ragasa Decl. ¶ 66.

Westerman assigned Vierra to investigate the July 9, 10, and 13, 2013 incidents.  8/18/15 Vierra Dep. Tr. at 114-15.  At Westerman's direction, Vierra consulted with the KFD, County Attorney's Office, and Human Resources Department because the closure of the tower involved public safety concerns.  *Id.* at 118.  A questionnaire was formulated to distribute to employees with knowledge of the closures.  *Id.*  Vierra interviewed Ragasa, other WSOs who worked at the Anahola tower, as well as Gonzalez and Love.  *Id.* at 150-155.  Vierra also reviewed the radio dispatch logs to determine whether the WSOs had called in to check out of the Anahola tower on July 10 and 13, 2013.  Ragasa was placed on leave pending the results of the investigation.  Westerman Ex. 25 (4/25/15 Letter).

In a September 9, 2013 letter, Westerman notified Ragasa that the investigation was complete and issued four separate NDAs: (1) a three-day suspension to Ragasa for leaving his post to get lunch without permission on July 9, 2013; (2) a five-day suspension for closing Anahola tower early on July 10, 2013; (3) another five-day suspension for closing Anahola tower early on July 13, 2013; and (4) a ten-day suspension for falsification of time-sheets and tower logs

when leaving Anahola tower for lunch without permission on July 9, 2013, and closing the tower early on July 10 and 13, 2013.  *See* Westerman Ex. 27 (9/9/15 Letter), and Exs. 28 through 31 (9/9/13 NDAs).

Ragasa grieved the NDAs.  *See* Westerman Ex. 35 (9/23/15 Step I Grievance) and Ex. 38 (11/29/13 Step II Letter).  At the Step II grievance hearing held on November 20, 2013, Ragasa notified Westerman that he had a tape recording of a July 2013 conversation between Hunter and Medeiros, in which the two are heard discussing the closing time of the Anahola tower.  Westerman Ex. 38 (11/29/13 Step II Letter) at 2.  Following the November 20, 2013 Step II grievance hearing, Westerman upheld the September 9, 2013 NDAs.  *Id.* at 2-3.  With respect to the early closures on July 10 and 13, 2013, he concluded—

> Although [Ragasa] denied closing the tower early, the investigation contradicts his claim.  In addition, [Ragasa] submitted Tower Logs and his time sheet reflecting that he had worked till 5:00 p.m. on both dates, thus committing the act of falsification of documents, which is a violation of OSB policy.
>
> The Department has an obligation to follow up on complaints received, and all information received through the investigation is carefully reviewed before action is taken.  Policies and operating guidelines are created for safety reasons and to maintain order within the organization and must be followed.  Leaving the tower without proper authorization is a clear violation.  Early closure of the tower is very serious in nature, as it affects the safety of the public we serve, and falsification of documents to cover up the violation compounds the issue.

*Id.* at 2.

Following a January 30, 2014 Step III grievance hearing, the County DHR reduced the disciplinary actions imposed by Westerman.  With respect to the July 9, 2013 incident, the Step III decision found that, although Ragasa "did not follow the established procedures to check out when leaving the tower for lunch while on duty," the "OSB Supervisor is not enforcing the established practice."  Westerman Ex. 40 (3/11/14 Step III Grievance Letter) at 4; *see also id.* at 5 ("[T]here seems to be a practice that the WSOs are not all checking-out or checking-in and the supervisors are not performing their job in following-up.").  Accordingly, "the discipline of three (3) days suspension is reduced to a written reprimand."  *Id.* at 5-6.  With respect to the early tower closures on July 10 and 13, 2013, the ten-day suspension for failure to check out was reduced to five days.  *Id.* at 6.  As for falsifying logs and timesheets, the Step III decision concludes that, although Ragasa's time records show that he was working when the Anahola tower was closed, his supervisor signed the timesheet, and KFD failed to show that he deliberately intended to deceive anyone.  *See id.* at 6-7.  Ragasa's ten-day suspension for this conduct was reduced to four days.  *Id.* at 7.

As a result of Ragasa's consolidated arbitration hearing in March 2015, and as determined in the August 7, 2015 Decision, the September 9, 2013 NDAs were

overturned.  The Arbitrator concluded that the four disciplinary actions were without "proper cause" because KFD did not "apply discipline evenhandedly" in this instance, where "other WSOs did not check out and there was no discipline taken against those WSOs."  Westerman Ex. 41 (8/7/15 Arbitration Decision) at 53. With respect to the July 10 and 13, 2013 incidents, the Arbitrator concluded that Vierra's investigation was not conducted fully and fairly because it did not uncover the relationship between Elizabeth Gonzalez and Hunter, and because Ragasa was not provided with unredacted copies of the complaints received from the public regarding the early closures.  *Id*. at 58-62.  The written reprimand for the July 9, 2013 lunch absence, and the five-day and four-day suspensions for the July 10 and 13, 2013 incidents, were rescinded and expunged from Ragasa's record.  *Id.* at 66.

## II.   **Procedural Background**

Ragasa filed his original complaint on July 7, 2014, and his First Amended Complaint on October 2, 2015.   According to Ragasa, shortly after his October 29, 2012 "protected acts," Defendants retaliated against him through a "campaign of retaliatory harassment" that violated his First Amendment rights and that included:

> bombarding [Ragasa] with a slew of false accusations of misconduct dating back over two years prior; knowingly instituting disciplinary proceedings based upon such false accusations; placing [Ragasa] on leave without pay while they

> purportedly investigated the charges that [Ragasa] engaged in
> misconduct years earlier; disparate treatment with respect to
> application of Kauai County rules and discipline of [Ragasa];
> and attempting to alienate [Ragasa] from his co-workers.

Complaint ¶ 14.  Ragasa contends that all Defendants were aware of his reporting

of illegal and/or improper conduct by KFD employees.  Complaint ¶ 13.

He alleges that Defendants conspired with one another to retaliate against him for

speaking out against improper or illegal conduct by KFD employees by:

> instructing KFD supervisors to "target" [Ragasa] for
> disciplinary action because [Ragasa] was causing trouble for
> KFD, and by encouraging employees to assert allegations of
> misconduct against [Ragasa] that were false, misleading, and/or
> exaggerated.  Many such allegations were used by Defendants
> to initiate disciplinary proceedings against [Ragasa], place him
> on administrative leave, and were later dropped, amended or
> not sustained.  The multiple suspensions and/or leaves without
> pay
> caused a financial burden on [Ragasa] and his family.

Complaint ¶ 18.

Ragasa believes that his suspensions are the result of his reports of gas theft

and drug use by co-workers, and a cover-up by KFD administrators.  He denies

threatening, blackmailing, or intimidating co-workers or supervisors.  According to

the County and individual Defendants, Ragasa is a difficult employee who exhibits

habitually poor workplace behavior.  They contend that he has a history of

aggressive conduct toward supervisors and WSOs, and that rather than acting as a

whistleblower, he only raises allegations of misconduct by others in response to complaints against himself in order to deflect blame.

Ragasa asserts the following claims in his First Amended Complaint: (1) First Amendment retaliation and conspiracy under 42 U.S.C. § 1983 against Westerman, Vierra, and Hunter in their individual capacities (Count I); (2) direct municipal liability against the County under 42 U.S.C. § 1983 (Count II); (3) Hawaii Whistleblowers Protection Act ("HWPA") liability pursuant to HRS § 378-62 against the County (Count III); (4) intentional infliction of emotional distress against the individual capacity Defendants ("IIED") (Count IV); and (5) *respondeat superior* and/or vicarious liability against the County (Count V). The County, along with Westerman, Vierra, and Hunter in their individual capacities, each move separately for summary judgment.

Hunter brings counterclaims against Ragasa for: (1) violation of 18 U.S.C. §§ 2511 and 2520, based upon an October 12, 2012 recording (Counterclaim I); (2) violation of Haw. Rev. Stat. §§ 803-42 and 803-48, based upon an October 12, 2012 recording (Counterclaim II); (3) violation of 18 U.S.C. §§ 2511 and 2520, based upon an August 7, 2014 recording (Counterclaim III); (4) violation of Haw. Rev. Stat. §§ 803-42 and 803-48, based upon an August 7, 2014 recording (Counterclaim IV); (5) violation of 18 U.S.C. §§ 2511 and 2520, based upon a

28

January 2014 recording (Counterclaim V); (6) violation of Haw. Rev. Stat. §§ 803-42 and 803-48, based upon a January 2014 recording (Counterclaim VI); (7) violation of 18 U.S.C. §§ 2511 and 2520, based upon a December 4, 2013 recording (Counterclaim VII); (8) violation of Haw. Rev. Stat. §§ 803-42 and 803-48, based upon a December 4, 2013 recording (Counterclaim VIII); (9) violation of 18 U.S.C. §§ 2511 and 2520, based upon a February 26, 2013 recording (Counterclaim IX); (10) violation of Haw. Rev. Stat. §§ 803-42 and 803-48, based upon a February 26, 2013 recording (Counterclaim X); (11) violation of 18 U.S.C. §§ 2511 and 2520, based upon a July 10, 2013 recording (Counterclaim XI); and (12) violation of Haw. Rev. Stat. §§ 803-42 and 803-48, based upon a July 10, 2013 recording (Counterclaim XII).  Ragasa moves to dismiss Hunter's Counterclaims.

## STANDARD OF REVIEW

### I.    Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## II.    <u>Motion to Dismiss</u>

"[T]o survive a Rule 12(b)(6) motion to dismiss, factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677.

## DISCUSSION

### I.     Count I: First Amendment Retaliation (42 U.S.C. § 1983)

#### A.     Legal Standard

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) a violation of a right secured by the Constitution and laws of the United States; and (2) that the deprivation was committed by a person acting under color of law. *West v. Atkins*, 487 U.S. 42, 48 (1988).  Public employees suffer a constitutional violation when they are disciplined for making protected speech. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 565 (1968).  Retaliation in the employment context is actionable under section 1983 when it is in response to a plaintiff's First Amendment activity.  *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003).

The Court follows a sequential five-step inquiry to determine whether an employer impermissibly retaliated against an employee for engaging in protected speech. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013).  "First, the plaintiff bears the burden of showing: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; and (3) whether the plaintiff's protected speech was a substantial or motivating factor in

the adverse employment action." *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009) (citation omitted).  "Next, if the plaintiff has satisfied the first three steps, the burden shifts to the government to show: (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech." *Id.*

### B.   Ragasa Engaged In "Protected Speech"

With respect to the first element, "[a]n employee's speech is protected under the First Amendment if it addresses 'a matter of public concern.'" *Coszalter*, 320 F.3d at 973 (citation omitted).  Speech concerning information that would enable members of society to make informed decisions about the operation of government should receive the most protection, while speech relating to "individual personnel disputes and grievances" that would be of "no relevance to the public's evaluation of the performance of government agencies" is not generally of public concern. *See McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983).  Courts look to the content, form, and context of the speech to determine whether it deals with an issue of public concern.  *See Connick v. Myers*, 461 U.S. 138, 147 (1983).  In evaluating the content, form, and context of a given statement, courts may consider the "motivation and the chosen audience" for the speech, *Johnson v. Multnomah*

32

*Cnty.*, 48 F.3d 420, 425 (9th Cir. 1995), but "'motive should not be used as a litmus test for public concern.'" *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 925 (9th Cir. 2004) (quoting *Havekost v. U.S. Dep't of Navy*, 925 F.2d 316, 318 (9th Cir. 1991)).

Ragasa contends that he engaged in protected speech on three occasions when he reported: (1) gas theft by County employees to Hunter in 2010; (2) drug use by an on-duty County employee to Hunter in 2012; and (3) gas theft and an alleged cover up of the theft to Vierra on October 29, 2012. Defendants argue that these acts were not protected speech, but were entirely self-serving on the part of Ragasa, involving his individual personnel disputes with the County and reflecting an effort to direct attention onto others. Regardless of his motivations, the Court agrees with Ragasa that his reports invoke matters of public concern.

In March 2010, Ragasa reported to Hunter that he observed another WSO stealing gas from the County. 8/19/2015 Ragasa Dep. Tr. at 28-33. Hunter relayed the report to his supervisor, Vierra, who told him that he would investigate. 7/29/15 Hunter Dep. Tr. at 42. According to Vierra, he then relayed Hunter's report to Westerman, and Westerman told Vierra to have Hunter interview the employee whom Ragasa had accused of stealing the gas. 8/18/15 Vierra Dep. Tr. at 40-41. Hunter reported back to Vierra that the employee denied any gas theft,

and no written report was made regarding the matter.  8/18/15 Vierra Dep. Tr. at 41.  Concurrently, a County-wide audit of gas dispensing practices was underway. As a result of the private audit, changes were made in the process of fueling County vehicles and special keys and gas cards were issued to personnel as control measures.  8/18/15 Vierra Dep. Tr. at 175; 7/29/15 Hunter Dep. Tr. at 46; 7/30/15 Westerman Dep. Tr. at 47-48, 178-180.  Clearly, the KFD administration considered the possible theft of County gas to be an important public matter, worthy of investigation upon Ragasa's report—just as the County took its gas dispensing practices seriously enough to authorize and pursue a County-wide audit.

Ragasa's report to Hunter sometime in early 2012 that another WSO was smoking marijuana on duty in the Anahola lifeguard tower is perhaps an even greater matter of public concern, given the public safety role that WSOs occupy. 8/19/15 Ragasa Dep. Tr. at 60-61.  Hunter again responded to Ragasa's complaint by informing Vierra and speaking to the employee alleged to have used drugs.  Ind. Cap. Hunter Decl. ¶¶ 22-23; *see also* 7/29/15 Hunter Dep. Tr. at 52-53.  Once more, Hunter took the matter seriously enough to investigate and report up his chain of command.

During the October 29, 2012 telephone call to Vierra, Ragasa raised the issue of "time sheet forgery" at the workplace violence training session, and

resurrected the issue of County gas theft.  8/18/15 Vierra Dep. Tr. at 72.  Vierra

filled out a KFD Form 110 and reported the matter to Westerman.  *Id.*  Westerman

ordered an investigation.  8/18/15 Vierra Dep. Tr. at 78-79, 174.  Ragasa

characterizes this protected speech as a report of a cover up of illegal conduct by

County employees.

    Here, the contents of Ragasa's speech—gas theft, drug use, falsification of

time records, and an alleged cover up, all by County employees—present questions

of public significance that relate to "matter[s] of political, social, or other concern

to the community.'"  *Johnson*, 48 F.3d at 422 (quoting *Connick v. Myers*, 461 U.S.

138, 146 (1983)).  Contrary to Defendants' characterization, this is not speech that

deals with mere "individual personnel disputes and grievances" that "would be of

no relevance to the public's evaluation of the performance of governmental

agencies," *McKinley*, 705 F.2d at 1114, "speech that relates to internal power

struggles within the workplace," or speech that is of no interest "beyond the

employee's bureaucratic niche."  *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204,

1210 (9th Cir. 1996) (citations omitted).

    With respect to the form and context of Ragasa's speech, the Court takes

note of the County's portrayal of his internal complaints as opportunistic and

defensive.  Westerman asserts that—

23.    In my experience as Chief over the past ten years Ragasa has never initiated a formal complaint within the Department of any type of law violation or policy violation in an independent effort to improve Departmental functions or to inform the Department or the public of any County misdeeds.

24.    In my experience as Chief over the past ten years Ragasa only raises written or oral allegations of alleged misconduct of the department as a whole or by individual officers in his defense regarding independent complaints against himself.

25.    In my experience as Chief over the past ten years Ragasa routinely and habitually cites to alleged instances of gas theft, drug use, ethics violations, and policy violations by fellow employees and or supervisors in response to any and all allegations of wrong doing against himself.
        . . .

27.    I never ordered anyone to retaliate against Ragasa because he was making unsubstantiated allegations about other people's alleged drug use, outside businesses or gas theft. Every time he brought these matters up, Ragasa was clearly making these allegations to try to deflect or distract or make excuses in response to his own personnel charges or to otherwise avoid taking responsibility for his own improper actions.  In every instance Ragasa's complaints were clearly motivated by personal interest and vindictiveness and not because he wanted to inform the public on matters of public concern.

Declaration of Robert F. Westerman in Support of Individual Capacity Motion

("Ind. Cap. Westerman Decl.") [Dkt. No. 106].  Ragasa, however, counters that he

"brought up the gas theft, falsification of time sheets, and illegal conduct of WSOs

because those acts were illegal and I believed Vierra was covering it up."  Ragasa

Decl. ¶ 19.  He also claims that he "was told by Westerman that they would not investigate my reports of WSO drug use, fighting on the job, leaving during lunch, closing towers early, and not radioing in because I brought it up during my grievance."  Ragasa Decl. ¶ 76.  In short, Ragasa's motivations are in dispute.

More importantly, while Defendants are correct that the form and context of Ragasa's statements matter, *content* is at the core of the Court's inquiry.  *See Johnson*, 48 F.3d at 424 ("[C]ontent is the greatest single factor in the *Connick* inquiry.") (citing *Havekost*, 925 F.2d at 318); *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1103 (9th Cir. 2011) ("Of [the] three factors, the content of the speech is generally the most important.").  Here, the content of Ragasa's speech clearly invokes matters of public concern.  *See Thomas v. City of Beaverton,* 379 F.3d 802, 809 (9th Cir. 2004) (finding that "[u]nlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern").  No other conclusion is reasonable, given the nature of Ragasa's complaints regarding, in particular, the theft of public property and drug use by public safety workers.  This is not a "close case, when the subject matter of a statement is only marginally related to issues of public concern," such that motivations and context might be determinative.  *Cf. Johnson*, 48 F.3d at 425.  The Court finds that his speech involved matters of public concern.

### C.   Questions of Fact Remain Regarding Whether Ragasa Spoke as a Private Citizen

Next, the Court considers whether Ragasa spoke "in the capacity of a private citizen and not a public employee." *Eng*, 552 F.3d at 1071.  A public employee speaks as a private citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform. *Id*.  While the question of the scope and content of a plaintiff's job responsibilities is a question of fact, the ultimate constitutional significance of the facts as found is a question of law. *See Dahlia v. Rodriguez,* 735 F.3d 1060, 1075 (9th Cir. 2013); *Robinson*, 566 F.3d at 823; *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008).

The Court first considers Ragasa's job duties.  Ragasa is employed in a non-supervisory WSO position.  According to Ragasa, his duties are to patrol the beaches, keep the public safe from dangers they may encounter in the water, and rescue swimmers in danger.  Ragasa Decl. ¶ 2.  There is no indication that Ragasa's speech was the product of "performing the tasks the employee was paid to perform." *Ellins*, 710 F.3d at 1058-59.

To the extent Defendants argue that Ragasa spoke as a public employee because he reported the alleged illegal conduct to his supervisors rather than the general public or media, this factor is relevant, but not dispositive. *See Dahlia*,

735 F.3d at 1074 ("Thus, we agree with the Fifth Circuit that, generally, 'when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job,' *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008), although 'it is not dispositive that a public employee's statements are made internally,' *id*. at 313 n.3.").  Indeed, Ragasa can hardly be faulted for following his chain of command and affording those in that chain the first opportunity to remedy the problems he identified.  It would ironic, at best, if the only way Ragasa could maintain his First Amendment retaliation claim was by airing the OSB's "dirty laundry" before the media.

Further, the Court also considers the subject matter of the communications. *See Dahlia*, 735 F.3d at 1074-75.  Here, Ragasa's allegations regarding a cover up by KFD administration and/or individual administrators appear to be well beyond the scope of his duties as a Water Safety Officer, and his allegations of gas theft and employee drug use can be characterized as "broad concerns about corruption or systemic abuse."  *Id*. ("[I]f a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee, except when the employee's regular job duties involve investigating

such conduct, *e.g.*, when the employee works for Internal Affairs or another such watchdog unit.").  Drawing all reasonable inferences in favor of the non-moving party, which the Court must do at this stage of the litigation, there is a genuine dispute of material fact as to whether Ragasa's complaints were made as a private citizen and not as a public employee.

### D.    Questions of Fact Remain Regarding Causation

At the third step, Ragasa must establish that his speech and an adverse employment action were sufficiently related such that the speech was a substantial or motivating factor in Defendants' retaliatory discipline.

#### 1.    Adverse Employment Action

The Court first examines whether Ragasa suffered an "adverse employment action."  For a First Amendment retaliation claim, courts consider whether the actions taken by the defendants were reasonably likely to deter the employee from engaging in protected activity under the First Amendment.  *Coszalter*, 320 F.3d at 976.  The government's act of retaliation "need not be severe and it need not be of a certain kind."  *Id.* at 975.

> The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases.  The goal is to prevent, or redress, actions by a government employer that chill the exercise of protected First Amendment rights. . . .  Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights.

*Id.* (citation omitted).

Construing the facts in the light most favorable to Ragasa, the Court finds that questions of fact remain with respect to each of the individual capacity Defendants. With respect to Westerman, he issued the ten NDAs that Ragasa alleges were in retaliation for his protected speech. Westerman upheld the disciplinary actions, including several multi-day suspensions at the Step II grievance levels. *See e.g.* Westerman Ex. 23 (5/10/13 Step II Letter); Westerman Ex. 38 (11/29/13 Step II Letter). These disciplinary actions affect the compensation, terms, and conditions of Ragasa's employment, and are of the type reasonably likely to deter an employee from engaging in protected activity under the First Amendment. *See Anthoine v. North Central Counties Consortium*, 605 F.3d 740, 750 (9th Cir. 2010).

Vierra reported Ragasa's October 29, 2012 telephone call on a KFD Form 110—Violence in the Workplace Report, and directed it to Westerman. 8/18/15 Vierra Dep. Tr. at 72. Vierra's KFD Form 110 states, "[Ragasa] [t]hreatened me that he has video of me stealing thousands of dollars of County gas. . . . Also told me that I gave myself a raise and I don't care [about] the guys on the line. His verbal tone was intimidating and anger." Westerman Ex. 3 (10/31/12 Vierra Form 110). According to Ragasa, these claims were false—

41

19.     I brought up the gas theft, falsification of time sheets, and illegal conduct of WSOs because those acts were illegal and I believed Vierra was covering it up.

20.     I have never threatened, intimidated or blackmailed Vierra at any time.  I did not tell Vierra I had a video of him.

21.     In retaliation for my bringing up the illegal acts and cover-up, Vierra filed a false workplace violence complaint against me.

Ragasa Decl. ¶¶ 19-21.  Ragasa also contends that Vierra was instrumental in the disciplinary actions taken against him because of the illegal acts initially raised during their October 29, 2012 telephone conversation.  8/18/15 Ragasa Dep. Tr. at 269-70.  According to Ragasa, Vierra selectively enforced complaints made by other WSOs and solicited KFD Form 103s from other WSOs documenting Ragasa's transgressions.  *See* 5/19/15 Vierra Dep. Tr. 738-741.  He maintains that Vierra conducted a biased and flawed investigation of the July 9, 10, and 13, 2013 incidents, and recommended a 30-day suspension, which directly led to the September 9, 2013 NDAs and suspensions.  *See* 5/19/15 Vierra Dep. Tr. 712-13; 8/18/15 Vierra Dep. Tr. at 100-06.  Taken as a whole, and viewed in the light most favorable to Ragasa, the Court concludes that a reasonable fact-finder could determine that such actions are reasonably likely to deter an employee from engaging in protected activity under the First Amendment.  *See Anthoine*, 605 F.3d at 750.

With respect to Hunter, Ragasa presents evidence that Hunter's various KFD Form 103s, Form 110s, and oral reports to his supervisors throughout 2010, 2012 and 2013 set in motion the disciplinary actions that followed.  According to Ragasa, Hunter selectively targeted him for discipline, evidenced by his submission of formal written complaints to Vierra and Westerman, rather than more informal verbal reprimands or counseling options.  *See* 7/29/15 Hunter Dep. Tr. 103-05, 117-22, 138-40.  Ragasa contends that several of Hunter's reports to Westerman were false, and that Hunter improperly renewed his 2010 complaint of workplace violence two years later in 2012, after the matter had been long-since resolved.  *See* Ragasa Ex. 11 (4/13/10 Hunter KFD Form 103); Ex. 12 (4/13/10 Hunter KFD Form 110); Ex. 13 (12/17/12 NDA Re: 3/25/10 Incident); Ex. 16 (9/13/12 Hunter KFD Form 103); Ex. 16 (1/27/13 Hunter KFD Form 103); Ex. 23 (7/10/13 Hunter KFD Form 103), attached to CSOF in Opposition to Hunter Motion [Dkt. No. 126].

Although Hunter himself did not issue the NDAs, he does not dispute that his reports set in motion the chain of events that led to Ragasa's suspensions.  *See Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 804-05 (9th Cir. 2009) ("[A]s a general matter the nature of § 1983 liability is such that the 'requisite causal connection can be established not only by some kind of direct personal

43

participation in the [adverse action], but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'") (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999)).  Moreover, under the standard discussed above, and viewing the record in the light most favorable to Ragasa, Hunter's conduct is reasonably likely to deter an employee from engaging in protected activity under the First Amendment.  Therefore, Ragasa introduced sufficient evidence of adverse employment actions with respect to each Defendant to defeat summary judgment.

## 2.    Causation

To establish that retaliation was a substantial or motivating factor behind an adverse employment action, a plaintiff may introduce evidence that (1) the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) the employer expressed opposition to the speech, either to the speaker or to others; or (3) the proffered explanations for the adverse action were false and pretextual.  *Coszalter*, 320 F.3d at 977.

Here, Ragasa introduced evidence that a significant portion of the protected speech and adverse actions taken by each of the Defendants were proximate in time.  *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008) ("We

have held that 'causation can be inferred from timing alone where an adverse

employment action follows on the heels of protected activity.'") (quoting

*Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1065 (9th Cir. 2002));

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th

Cir. 2000) ("[W]hen adverse employment decisions are taken within a reasonable

period of time after complaints of discrimination have been made, retaliatory intent

may be inferred.").

For example, Ragasa first raised the issue of gas theft by a County employee

to Hunter in March 2010.  8/19/2015 Ragasa Dep. Tr. at 28-33.  Ragasa claims that

this employee was a friend and business associate of Vierra.  8/19/2015 Ragasa

Dep. Tr. at 43-50.  There is evidence that Hunter, Vierra, and Westerman each

knew of Ragasa's allegations that Vierra's business partner was stealing County

gas at this point in 2010.

On March 25, 2010, shortly after Ragasa reported the gas theft, Hunter

arrived at the Anahola tower and confronted Ragasa.  Ragasa Decl. ¶ 12.  As a

result of this confrontation, on April 13 and 14, 2010, Hunter filed a KFD Form

103 and a Form 110 – Violence in the Workplace Report.  In the April 13 and 14,

2010 reports, Hunter claims Ragasa raised his voice, started waving his arms,

"threatening to bring down the lifeguard program and Fire Dept."  Ragasa Ex. 12

(4/13/10 Hunter KFD Form 110).  Vierra was assigned to investigate Hunter's complaint, and Hunter and Ragasa thereafter worked it out in person during a conversation at the Anahola tower.  Ragasa Decl. ¶ 13; 8/18/15 Vierra Dep. Tr. at 91-92.  Hunter later raised these allegations again with KFD administration in February 2012, and they served, in part, as the basis for Ragasa's ten-day suspension issued on December 17, 2012.  *See* Westerman Ex. 13 (12/17/12 NDA).

Sometime in early 2012, Ragasa reported to Hunter that another WSO, who this time was a friend of Hunter, was smoking marijuana on duty in the Anahola tower.  Ind. Cap. Hunter Decl. ¶ 19; 8/19/15 Ragasa Dep. Tr. at 60-61, 193.  According to Ragasa, Hunter's response was that he would speak to the employee, and Ragasa believes that the employee was transferred to a different lifeguard tower following his report to Hunter, because he never worked with that employee again.  8/19/15 Ragasa Dep. Tr. at 69, 171-72.  Several months later, Hunter submitted a KFD Form 103 regarding Ragasa's ongoing intimidating behavior toward other lifeguards at the Anahola tower, describing "a serious pattern of intimidation towards lifeguards . . . we have all tolerated this for a very long time, and patience is very thin."  Ragasa Ex. 15 (9/13/12 Hunter KFD Form 103).  Ragasa denies intimidating any of the other lifeguards at the Anahola tower, but

contends that one of the WSOs who had accused him of intimidating behavior was the same WSO whom he had reported to Hunter for using drugs while on duty a few months earlier.  Ragasa Decl. ¶¶ 34, 38.

The temporal proximity between Ragasa's October 29, 2012 telephone conversation with Vierra and the disciplinary actions that followed in November and December 2012 is similarly very close.  Following his accusations of gas theft, time-sheet falsification, and a cover up on October 29, 2012, Ragasa was placed on leave pending investigation, effective November 6, 2012.  Westerman Ex. 4 (11/5/12 Letter).  He was suspended on December 17, 2012.  Westerman Exs. 9-12 (12/17/12 NDAs) and Ex. 13 (Amended 1/14/13 NDA).

Hunter then filled out a KFD Form 103, dated January 27, 2013, following a January 24, 2013 conversation, relating that Ragasa was unhappy with his suspension.  According to Hunter, Ragasa asked him "if during him (Carl) reporting gas theft a couple of years ago if I knew about it.  I said yes I reported it.  We followed protocol and my supervisors did [their] investigations.  He then said again, So I did know of the investigation, I said yes and it was reported."  Ragasa Ex. 19 (1/27/13 Hunter KFD Form 103), attached to CSOF in Opposition to Hunter Motion [Dkt. No. 126].  Hunter understood Ragasa to be raising "issues that the county was covering up," and leveling accusations that Hunter knew "of all the

wrongs that the administration is doing." 7/29/15 Hunter Dep. Tr. at 72.

Westerman notified Ragasa by letter dated January 29, 2013 that he was again

being placed on leave pending investigation. Westerman Ex. 19 (1/29/13 Letter).

Ragasa related to the investigator, that Hunter told him during their January 24,

2013 phone call "about all the criminal action [] not being reported and that

[Deputy Chief] Blalock said Hunter would be demoted if he doesn't write up some

guys, all false stuff." Westerman Ex. 20 (2/25/13 Report) at 5. Ragasa was

suspended for the January 24, 2013 conversation with Hunter via an April 3, 2013

NDA. Westerman Ex. 21 (4/3/13 NDA). Ragasa's October 29, 2012 telephone

conversation with Vierra, his follow up conversation with Hunter on January 24,

2013, and the disciplinary actions that followed on April 3, 2013 are temporally

proximate, sufficient to infer retaliation.

Under Ninth Circuit precedent, "a specified time period cannot be a

mechanically applied criterion" for an inference of retaliation; instead, "[w]hether

an adverse employment action is intended to be retaliatory is a question of fact that

must be decided in the light of the timing and the surrounding circumstances."

*Coszalter*, 320 F.3d at 978. Nevertheless, "[d]epending on the circumstances,

three to eight months is easily within a time range that can support an inference of

retaliation." *Id.* at 977. The close temporal proximity between Ragasa's protected

speech in early 2012 and his October 29, 2012 conversation with Vierra, and the

resulting discipline in 2012 and 2013, are within the time range that can support an

inference of retaliation, especially when viewed along the accumulating spectrum

of enforcement here.  The continuation of similar conduct from early 2013 through

July 2013, including alleged selective enforcement in an effort to conspire against

Ragasa, is not outside of the range that has been found to support an inference of

retaliation.  *See Coszalter*, 320 F.3d at 977-78 (rejecting bright-line rule that a

certain period of time is per se too long to support an inference of retaliation); *id.* at

977 ("As we recently held in another § 1983 First Amendment employer retaliation

case, '[a]n eleven-month gap in time is within the range that has been found to

support an inference that an employment decision was retaliatory.'") (quoting

*Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002)).

Moreover, Defendants' individual knowledge of Ragasa's protected speech,

going back to 2010 and then resurrected to punish him in 2012, considered under

the totality of the circumstances, supports an inference of retaliation by each of the

actors here.  *Cf. Marable v. Nitchman*, 511 F.3d 924, 930 (9th Cir. 2007) (allowing

a close temporal connection to establish substantial motive even though defendants

claimed no knowledge of the employee's protected speech and asserted

independent reasons for disciplining the employee).  In sum, Ragasa provided

evidence of a close temporal link between his protected speech and Defendants' adverse employment actions, sufficient to preclude summary judgment on the issue of "substantial or motivating factor."

Ragasa has also provided some evidence, however slight, showing that some Defendants' "proffered explanations for the adverse employment action[s] were false and pretextual." *Coszalter*, 320 F.3d at 977 (quoting *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 752 (9th Cir. 2001)).  For example, Hunter allowed WSOs other than Ragasa to leave their tower for lunch without permission and without subjecting them to discipline.  7/29/15 Hunter Dep. Tr. at 130-42.   In addition, WSO Chad Medeiros was not disciplined for closing the Anahola tower early on July 10, 2013, the same conduct that served as the basis for one of Ragasa's NDAs.  7/29/15 Hunter Dep. Tr. at 131-44, 189-97; 8/18/ 15 Vierra Dep. Tr. 140-41.  With respect to Vierra's investigation of the July 9, 10, and 13, 2013 incidents, Ragasa points to the failure of Hunter to disclose to Vierra or Westerman that his wife and her co-worker were the two members of the public who submitted the complaints to the Mayor's office regarding the early tower closure.  *See* Westerman Ex. 41 (8/7/15 Arbitration Decision) at 58-62.

Ragasa insists that Defendants conspired to punish him for his protected speech by documenting his transgressions on KFD Form 103s and 110s.  Although

his accounts are disputed, Ragasa claims that Hunter told him during their January 24, 2013 conversation that, "the County is corrupt.  He told me he was being attacked by upper management and would get fired or demoted if he didn't write up the guys at Anahola Tower.  Hunter also complained about all the cover-ups by the County."  Ragasa Decl. ¶ 40.  Ragasa also points to a conversation that WSO Emura had with Hunter on January 24, 2013, sometime after Hunter's call with Ragasa, in which "Hunter admitted to [Emura] that KFD administration was out to get Carl Ragasa and that they were willing to falsify documents to achieve their goal of getting him out."  Emura Decl. ¶ 7.  *But see* Ind. Cap. Hunter Decl. ¶¶ 32-36; Ind. Cap. Westerman Decl. ¶¶ 27-29.

Although tenuous, viewed in the light most favorable to Ragasa, a reasonable fact finder could find from the evidence of inconsistent application of departmental policies that the Defendants' motivation for enforcing the policies against Ragasa was retaliation for his constitutionally protected speech.  A reasonable fact finder could also find that such pretextual explanations cast doubt on other explanations that, standing alone, might appear to be true.  Thus, construing the record in the light most favorable to Ragasa, the Court finds that issues of fact preclude summary judgment on causation.

### E.   Defendants Fail to Meet Their Burden on the Remaining Elements

#### 1.   Adequate Justification (*Pickering* Balancing Test)

If a plaintiff satisfies the first three steps, the burden shifts to the defendant

to show that it had an adequate justification for its treatment of the employee.

More specifically, using the balancing test established by *Pickering v. Bd. of Educ.*,

391 U.S. 563, 568 (1968), courts must weigh the state's administrative interests

against the employee's First Amendment rights.  *Eng*, 552 F.3d at 1071 (citing

*Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004)).  For a court "to

find that the government's interest as an employer in a smoothly-running office

outweighs an employee's first amendment right, defendants must demonstrate

actual, material and substantial disruption, or reasonable predictions of disruption

in the workplace."  *Robinson,* 566 F.3d at 824 (internal quotation marks and

alteration omitted).  This issue is ultimately a legal determination but often turns

on questions of fact.  *Eng*, 552 F.3d at 1071-72.

Collectively, Defendants spend almost no time addressing this element.

Hunter nakedly asserts that his administrative interests "greatly outweigh

Plaintiff's interests" without offering any explanation or evidence in support of his

conclusion. *See* Hunter Motion at 18.  Vierra asserts that Defendants' actions were

appropriate because Ragasa "generally admits to in fact committing virtually every

infraction for which he was disciplined" (*see* Vierra Motion at 24-25) when, for purposes of summary judgment, that is simply not true. *See e.g.* CSOF in Opposition to Vierra Motion (Dkt. No. 128) at 2-4. Westerman does not address the *Pickering* balancing test at all.

Accordingly, Defendants fail to meet their summary judgment burden on this element.

### 2. <u>But-for Cause</u>

Finally, if the government fails the *Pickering* balancing test, it alternatively bears the burden of demonstrating that it "would have reached the same [adverse employment] decision even in the absence of the [employee's] protected conduct." *Thomas*, 379 F.3d at 808 (quoting *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 976-77 (9th Cir. 2002)). In other words, the employer may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996). This fifth step is purely a question of fact and requires the Court to assume, on summary judgment, the truth of Ragasa's version of disputed issues. *Id*. Here, Defendants contend that they would have disciplined Ragasa in the same fashion, even in the absence of his protected speech. They also argue, as

in the fourth step above, that Ragasa admits to the basic factual conduct underlying the disciplinary actions imposed.  *See, e.g.,* Vierra Motion at 24-25; Hunter Motion at 19-20.  Ragasa, however, disputes much of the conduct described in the NDAs, and specifically avers—

> 20.    I have never threatened, intimidated or blackmailed Vierra at any time.  I did not tell Vierra I had a video.
>           …
>
> 37.    I never coerced, attempted to coerce, intimidated or blackmailed any of my co-workers or supervisors to make statements on my behalf.
>           …
>
> 50.    On July 10, 2013, I did not leave Anahola beach prior to 4:40.  After shutting down the tower, our practice is to patrol the beach one final time.  This usually takes 5-10 minutes.  I patrolled the beach after closing the Anahola Tower on July 10, 2013 and before returning the truck to base.
>
> 51.    I did not leave Anahola beach prior to 4:40 on July 13, 2013.

Ragasa Decl.  Ragasa also maintains that other WSOs were not disciplined for similar transgressions—

> 47.    During the whole time I worked under Hunter, Hunter permitted WSOs to leave their Towers to pick up lunch, as long as at least one guard remained at the tower.  Hunter did not require guards to radio or call him before leaving.  Hunter previously stated to me and other guards that as long as somebody cover or got coverage, somebody can run and get lunch.

. . .

65.     Prior to writing me up in July of 2013, Hunter never spoke to me or warned me about complaints that I was closing the tower early, nor did he speak to me or warn me that I was not supposed to leave at lunch and/or that I must call in first.

66.     Prior to July 13, many WSO's closed their towers a few minutes early and did not routinely check out via radio from their towers when they closed their towers.  I can hear if and when the WSO's radio dispatch over the radio.

…

76.     I was told by Westerman that they would not investigate my reports of WSO drug use, fighting on the job, leaving during lunch, closing towers early, and not radioing in because I brought it up during my grievance.

Ragasa Decl.  The record is controverted with respect to Defendants' disciplinary actions and whether policies were selectively enforced against Ragasa.  Taking Ragasa's version of the facts as true, as it must at this juncture, the Court finds that Defendants have not met their burden of establishing that they would have made the same employment decisions, even absent the questioned speech.

Accordingly, upon consideration of the five-step First Amendment retaliation analysis, the Court concludes that issues of fact remain, precluding summary judgment on Count I.

**F.**     **Defendants Are Not Entitled to Qualified Immunity**

Defendants contend that they are entitled to qualified immunity.  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  To determine whether a government official is entitled to qualified immunity, we ask two questions: whether the official violated a statutory or constitutional right, and whether that right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

At the time period in question, from 2010 through 2013, constitutional protections afforded to employee speech and First Amendment claims for retaliation against protected speech were clearly established.  *See Ellins*, 710 F.3d at 1065 (discussing contours of clearly established right to be free from First Amendment retaliation as of 2009); *Coszalter*, 320 F.3d at 979 (holding that city officials were not entitled to qualified immunity because "both the constitutional protection of employee speech and a First Amendment cause of action for retaliation against protected speech were clearly established" at least as of 1989).

Because issues of fact persist with respect to the propriety of Defendants' conduct subsequent to Ragasa's exercise of his First Amendment rights, facts that must be viewed in the light most favorable to Ragasa, the Court concludes that Westerman, Vierra, and Hunter are not entitled to qualified immunity on summary judgment.

## II.    <u>Count II: Municipal Liability (42 U.S.C. § 1983)</u>

The Court next turns to the County's motion for summary judgment on Count II.  A section 1983 plaintiff may establish municipal liability in one of three ways: (1) "a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) "the individual who committed the constitutional tort was an official with final policy-making authority"; and (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992) (internal citations and quotation marks omitted).  Ragasa attempts to establish such liability under all three theories.

### A.    <u>Ragasa Fails to Establish a Custom or Practice of Retaliation</u>

The official policy or custom requirement limits municipal liability "to acts which the municipality has officially sanctioned or ordered."  *Pembaur v. City of*

*Cincinnati*, 475 U.S. 469, 480 (1986).  Even if the unconstitutional practice is not

authorized by written law or policy, the municipality may still be liable when the

practices are "so permanent and well-settled as to constitute a 'custom or usage'

with the force of law."  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978).

Because Ragasa does not appear to identify any County policy, the Court focuses

its analysis on an unconstitutional custom.  "Absent a formal governmental policy,

[plaintiffs] must show a 'longstanding practice or custom which constitutes the

standard operating procedure of the local government entity.'"  *Trevino v. Gates*,

99 F.3d 911, 918 (9th Cir. 1996).  The custom must be "persistent and widespread"

and "may not be predicated on isolated or sporadic incidents; it must be founded

upon practices of sufficient duration, frequency and consistency that the conduct

has become a traditional method of carrying out policy."  *Id.*

Through the County's discovery responses, Ragasa identified eight WSOs

who allegedly suffered First Amendment retaliation for reporting misconduct by

other WSOs.  *See* County Ex. 3 (8/23/15 Response to Interrogatories).  They are:

Myles Emura, Chad Medeiros, Kaipo Jacquias, Mark McKamey, Tyson Hawelu,

Kai Wedemeyer, Roy Yamagata, and Defendant Hunter.  *Id.*

In its motion, the County presents evidence with respect to each of the

identified WSOs rebutting Ragasa's custom or practice claim.  With respect to

WSOs Hawelu, Yamagata and Wedemeyer, for instance, Ragasa does not identify any protected speech sufficient to establish a First Amendment violation. *See* County Motion at 12-18. Nor does he rebut the County's showing that Westerman, the KFD Chief through whom Ragasa attempts to establish his custom and practice claim, (1) was without knowledge of any alleged KFD custom and practice of First Amendment retaliation, (2) was not aware that retaliation allegedly occurred with respect to any of the eight WSOs, and (3) believed that KFD had legitimate, non-retaliatory reasons for its decision-making with respect to each of the identified WSOs. *See* County Motion at 19-22; Declaration of Robert Westerman in Support of County Motion ("Off. Cap. Westerman Decl.") at ¶¶ 20-34 [Dkt. No. 116]. In his opposition, Ragasa fails to present any evidence whatsoever raising triable issues of fact with respect to his custom and practice claim.

In short, there is no evidence of any longstanding custom or practice which constitutes the standard operating procedure of the County to retaliate against employees based upon their protected speech. *Trevino*, 99 F.3d at 918. Certainly, there are no genuine issues of material fact regarding any County custom founded upon practices of sufficient duration, frequency and consistency. *See id.* The County is therefore entitled to summary judgment on this theory of liability.

**B.**     <u>Official With Final Policy-Making Authority</u>

Under the second *Monell* theory, Ragasa argues that Westerman is an

official with final policy-making authority for purposes of imposing municipal

liability.  Whether a particular official has final policy-making authority is a

question of state law.  *See Gillette*, 979 F.2d at 1346.  Ragasa points to no state law

supporting the notion that Westerman had final policy-making authority with

respect to employee discipline.  Instead, in his opposition to the County's motion,

Ragasa unconvincingly points to the following colloquy at Westerman's deposition

to establish his final policy-making theory:

> Q.     Are you also the person that's responsible for issuing
> discipline?
>
> A.     Yes.

Ragasa Ex. 3 (7/30/15 Westerman Dep. Tr. at 41).  This brief question and

response, however, does little to establish as a matter of state law that Westerman

has final policy-making authority to discipline KFD employees.

Westerman acknowledges that as the administrative head and Chief of KFD,

he is empowered to mete out discipline to KFD employees.  Westerman, however,

also presents evidence that he is not the "official with final policy-making

authority" on matters of discipline because the County DHR can alter, amend, or

even overturn his disciplinary actions.  In this instance, DHR actually did so on

several occasions.  *See* Westerman Ex. 39 (1/13/2014 Step III Grievance

Decision); Westerman Ex. 40 (3/11/2014 Step III Grievance Decision).  Ragasa

does not dispute that DHR reduced the bulk of his suspensions first noticed by

Westerman.  *See* 8/19/15 Ragasa Dep. Tr. at 163.  Because Westerman's

disciplinary actions can be and have been overturned by DHR, he does not have

final authority to impose discipline over WSOs, and Ragasa has not established

that Westerman is an official with final policy-making authority for municipal

liability purposes.  Ragasa fails to raise any genuine issue sufficient to defeat

summary judgment on this claim.

### C.    <u>Ratification</u>

With respect to ratification, the third *Monell* theory, Ragasa must establish

that an official with final policy-making authority ratified a subordinate's

unconstitutional decision or action and the basis for it.  *See Christie v. Iopa*, 176

F.3d 1231, 1239 (9th Cir. 1999) (ratification requires proof of a policymaker's

knowledge of the alleged constitutional violation); *Trevino*, 99 F.3d at 920

(ratification requires an adoption and express approval of the acts of others who

caused the constitutional violation); *Gillette*, 979 F.2d at 1348 (an official

policymaker must "make a deliberate choice from among various alternatives to

follow a particular course of action").  Once again, Ragasa attempts to establish

municipal liability through Westerman, asserting that he is the one who "ratified Hunter and Vierra's retaliatory workplace violence complaints."

For the reasons discussed above, however, this is far from enough to establish ratification.  Regardless of whether or not Westerman approved of the acts of Hunter and/or Vierra, his actions can be, and have been, overturned by DHR.  Westerman is not an official with final policy-making or ratification authority for municipal liability purposes.

In summary, even viewing the facts in the light most favorable to Ragasa, he fails to raise any genuine issue of material fact on his section 1983 municipal liability claim against the County.  The County's motion is GRANTED as to Count II.[4]

## III.    Count III: HWPA Claim

The County moves for summary judgment on Count III for violation of HRS § 378-62.  Under the HWPA, it is unlawful for an employer to discriminate against an employee because the employee "reports or is about to report to the employer,

---

[4]Ragasa's motion to strike the additional exhibits and supplemental declaration attached to the County's Reply Brief in support of its motion is hereby GRANTED.  *See* Dkt. No. 142.  The County did not seek leave of Court to provide the supplemental declaration or exhibits as required by the rules of Court.  *See* Local Rule 56.1(h) ("Affidavits or declarations setting forth facts and/or authenticating exhibits, as well as exhibits themselves, shall only be attached to the concise statement.  *Supplemental affidavits and declarations may only be submitted with leave of court*.") (emphasis added).

or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of [a] law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States." HRS § 378-62(1)(A).

To establish a prima facie claim of retaliation under the HWPA, Ragasa must prove that (1) he engaged in a protected activity, (2) he was subjected to an adverse employment action, and (3) the adverse employment action resulted because of the participation in the protected activity. *See Cambon v. Starwood Vacation Ownership, Inc.*, 945 F. Supp. 2d 1133, 1142-43 (D. Haw. 2013); *Griffin v. JTSI, Inc.*, 654 F. Supp. 2d 1122, 1130-32 (D. Haw. 2008) (citing *Crosby v. State Dep't of Budget & Fin.*, 76 Hawai'i 332, 876 P.2d 1300, 1310 (1994)). For the reasons discussed previously with respect to Ragasa's Count I First Amendment retaliation claim, the Court likewise finds that issues of fact preclude summary judgment on Ragasa's HWPA claim.

Ragasa engaged in protected activities when he reported suspected violations of law including gas theft, employee drug use on duty, and falsification of time sheets to his employer. *See* HRS § 378-62(1)(A). These reports each involve matters of public concern. Ragasa was also subjected to adverse employment actions effecting the terms and conditions of his employment, including multiple

suspensions, purportedly in retaliation for reporting the suspected violations of law. *See Cambon*, 945 F. Supp. 2d at 1143. Finally, with respect to the third element, Ragasa has raised genuine issues of fact regarding whether his protected activity was the "substantial or motivating factor" for the adverse actions that he endured. *Griffin*, 654 F. Supp. 2d at 1131 n.20 ("The Hawaii Supreme Court seems to agree that there is no required level of substantiality, requiring only that the employee's protected conduct 'played a role in the employer's action.'") (citing *Crosby*, 76 Hawai'i at 342, 876 P.2d at 1310). Viewing the evidence in the light most favorable to Ragasa, whether the disciplinary actions taken against him would have occurred regardless of his protected activity is a question of fact that cannot be resolved on summary judgment. *See Chan v. Wells Fargo Advisors, LLC*, 2015 WL 5011457, at *7 (D. Haw. Aug. 24, 2015) ("The employer can then defend [an HWPA action] by affirmatively showing that the challenged action would have occurred regardless of the protected activity.") (citing *Crosby*, 76 Hawai'i at 342, 876 P.2d at 1310).

Consequently, the County's motion for summary judgment is DENIED as to Count III.

## IV.   Count IV: IIED Claim

Ragasa alleges in Count IV that Westerman, Hunter and Vierra "falsely accused Plaintiff of engaging in criminal behavior, including blackmail and falsification of timesheets, and subjected Plaintiff to disciplinary action based upon such false accusations."  Complaint ¶ 39.  He also alleges that Hunter conspired "with his wife and her friend to submit false complaints against [Ragasa] to the Mayor's Office accusing [Ragasa] of abandoning his lifeguard tower while on duty."  Complaint ¶ 40.

Ragasa alleges that the individual capacity Defendants conspired with one another to retaliate against him by:

> instructing KFD supervisors to "target" [Ragasa] for disciplinary action because [Ragasa] was causing trouble for KFD, and by encouraging employees to assert allegations of misconduct against [Ragasa] that were false, misleading, and/or exaggerated.  Many such allegations were used by Defendants to initiate disciplinary proceedings against [Ragasa], place him on administrative leave, and were later dropped, amended or not sustained.  The multiple suspensions and/or leaves without pay caused a financial burden on [Ragasa] and his family.

Complaint ¶ 18.

"The elements of the tort of intentional infliction of emotional distress are 1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to

65

another." *Hac v. Univ. of Haw.*, 102 Hawai'i 92, 106-07, 73 P.3d 46, 60-61 (2003) (adopting IIED standard from Restatement (Second) of Torts). "The question whether the actions of the alleged tortfeasor are . . . outrageous is for the court in the first instance, although where reasonable persons may differ on that question it should be left to the jury." *Nagata v. Quest Diagnostics Inc.,* 303 F. Supp. 2d 1121, 1127 (D. Haw. 2004).

With respect to IIED's second element, the Restatement describes what constitutes "outrageous" conduct:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46, cmt. d. (1965).

"Hawaii 'courts have generally been reluctant to define conduct as outrageous.'" *Hughes v. Mayoral,* 721 F. Supp. 2d 947, at 965 (D. Haw. 2010) (quoting *Nagata v. Quest Diagnostics Inc.,* 303 F. Supp. 2d at 1127 (D. Haw.

2004)).   This district court has further explained the particularly high threshold for

"outrageous" conduct in the context of employment cases:

> Hawaii's definition of outrageous conduct creates a very high
> standard of conduct in the employment context.  *See Ross v.*
> *Stouffer Hotel Co.*, 76 Hawai'i 454, 879 P.2d 1037, 1048
> (1994) (granting summary judgment for employer on
> employee's IIED claim); *Ingle v. Liberty House, Inc.*, Civil No.
> 94-0787(3), 1995 WL 757746, at *4 (Haw. Cir. Ct. Oct. 12,
> 1995) (noting, "In *Ross*, the Hawai'i Supreme Court recently
> has set an extremely high standard for such a claim in the
> employment context[.]").  Under Hawai'i law, termination
> alone is not sufficient to support an IIED claim; rather, what is
> necessary is a showing of something outrageous about the
> manner or process by which the termination was accomplished.
> As stated in *Ingle*, "[a]lthough intentional infliction claims
> frequently are asserted in connection with employee dismissals,
> recovery is rare.  Imposition of liability on this tort theory is
> likely only in the unusual case when an employer deliberately
> taunts an employee, or when an employer handles an employee
> with outrageous insensitivity."  *Ingle*, 1995 WL 757746, at *4
> (quotation omitted; emphasis added); *see also Courtney v.*
> *Canyon Television & Appliance Rental, Inc.*, 899 F.2d 845, 852
> (9th Cir. 1990) ("[d]ischarge, without evidence of more, does
> not create a case for emotional distress.").

*Ho-Ching v. City & County of Honolulu*, 2009 WL 1227871, at *12 (D. Haw. Apr.

29, 2009).  *See also Simmons v. Aqua Hotels & Resorts, Inc.*, 130 Hawai'i 325,

332, 310 P.3d 1026, 1033 (App. 2013) ("Our case law is clear that termination

alone, even if based on discrimination, is not sufficient to support an IIED claim

without a showing of something outrageous about the manner or process of

termination."); *Shoppe v. Gucci Am., Inc.*, 94 Hawai'i 368, 387, 14 P.3d 1049,

1068 (2000) (employee's allegations of termination based on age discrimination and of manager's "vicious" verbal attack, shouting, and criticism in front of other employees were insufficient to create a genuine issue of fact of outrageousness); *Ross*, 76 Hawaiʻi at 465, 879 P.2d at 1048 (termination based on alleged marital status discrimination was insufficient to sustain IIED claim).

In the instant case, even assuming the truth of his disputed allegations regarding false accusations that resulted in disciplinary actions and complaints to the Mayor's office, Ragasa has not met the "very high standard of conduct in the employment context" necessary to state a claim for IIED. *Ho-Ching*, 2009 WL 1227871, at *12. Without more, his disputed allegations that the individual capacity Defendants targeted, conspired, harassed, and disciplined him in retaliation for his reports of improper conduct by coworkers are not "so outrageous in character as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement § 46, cmt. d. While obviously far from admirable, this conduct, even if proved, does not "exceed all bounds usually tolerated by a decent society and which is of a nature especially calculated to cause, and does cause, mental distress of a very serious kind." *Hac*, 102 Hawaiʻi at 106, 73 P.3d at 60. For example, Defendants did not refer Ragasa to law enforcement for investigation, nor did they file a police report.

Defendants did not have Ragasa arrested nor did they publicly ridicule him or accuse him of anything (*e.g.*, blackmail or falsification of records).  *Cf. Machado v. Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers*, 454 F. Supp. 2d 1056, 1063 (D. Haw. 2006) (Denying motion to dismiss IIED claim against individual capacity defendant who "filed a false police report," "made a false report defaming and accusing Plaintiff of assaulting and robbing him at an illegal cockfight," "announced these false accusations at a general union meeting," and "announced that he filed for a temporary restraining order against Plaintiff."); *Weaver v. A-American Storage Mgmt. Co*., 2011 WL 97651, at *8 (D. Haw. Jan. 12, 2011) ("Intentionally discriminating against an employee based on race, terminating him after only a few weeks in violation of federal and state law, evicting him, taking his residence and car, forcing him to remove his belongings to the street, and later giving false information to prospective employers could constitute 'outrageous' conduct for purposes of IIED.").  In fact, Ragasa was never terminated and remains a KFD employee even now.

Because Ragasa's assertions fall short of the extremely high standard of outrageous conduct required for an IIED claim in the employment context, summary judgment is GRANTED as to Count IV.

## V.   <u>Count V: *Respondeat Superior*</u>

The County seeks summary judgment on Ragasa's Count V claim based upon *respondeat superior* liability.  Under this doctrine, the employer "is held accountable and liable for the negligent acts of its employees; if an employee is immune from suit, then the employer is also immune from suit and cannot be held liable." *Reed v. City & Cnty. of Honolulu*, 76 Haw. 219, 227, 873 P.2d 98, 106 (1994).  The County argues that it is entitled to summary judgment on Count V because Ragasa's state law claims alleged in Count III (HWPA) and Count IV (IIED) fail, and therefore, his dependent *respondeat superior* claim in Count V must also fail.

The motion is denied in part and granted in part.  Because the Court has denied the County's concomitant motion with respect to Count III, it likewise DENIES the County's motion under Count V, to the extent *respondeat superior* liability attaches to such a claim in the first place.[5]  The Court GRANTS the motion as to Count V with respect to Ragasa's Count IV IIED claim against the

---

[5]As the Court noted in its previous Order dismissing Ragasa's HWPA claim against the individual capacity Defendants, such claims may not be brought against individual employees and supervisors—only "employers" may be sued under the statute.  *See* Dkt. No. 85 (9/15/15 Order).  Thus, it would appear that the Count III HWPA claim against an employer is inconsistent with *respondeat superior* liability.  Because the issue was not briefed by the parties, the Court does not reach it here.

individual capacity Defendants—his *respondeat superior* claim against the County based upon that state law tort likewise fails.

## VI.   Ragasa's Motion to Dismiss Hunter's Counterclaims

The Court next turns to Ragasa's motion to dismiss Hunter's Counterclaims. Hunter alleges that Ragasa, and WSOs Chad Medeiros and Kaipo Jacquias, made illicit recordings without the consent of others during telephone conversations, grievance hearings, and informal work conversations, and that Ragasa improperly disclosed these recordings to others.

Hunter seeks relief under federal and state electronic communications privacy laws, alleging that he and others were illegally recorded for the purpose of extortion.  Hunter asserts six counts for violations of 18 U.S.C. §§ 2511 and 2520 (Counterclaims I, III, V, VII, IX, and XI), and six counts for violations of HRS §§ 803-42 and 803-48 (Counterclaims II, IV, VI, VIII, X, and XII).  Ragasa moves to dismiss all counts.

Under 18 U.S.C. § 2520, the following persons may bring a civil suit for violations of section 2511:

> any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.

71

18 U.S.C. § 2520(a).

Hawaiʻi state law provides a similar civil cause of action as follows:

> Any person whose wire, oral, or electronic communication is accessed, intercepted, disclosed, or used in violation of this part shall[:]
>
> > (1) Have a civil cause of action against any person who accesses, intercepts, discloses, or uses, or procures any other person to access, intercept, disclose, or use the communications[;] and
> >
> > (2) Be entitled to recover from any such person:
> >
> > > (A) The greater of[:]
> > >
> > > > (i) The sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation[;] or
> > > >
> > > > (ii) Statutory damages of the greater of $100 a day for each day of violation or $10,000;
> > >
> > > (B) Punitive damages, where appropriate; and
> > >
> > > (C) A reasonable attorney's fee and other litigation costs reasonably incurred.

HRS § 803-48.

## A.   <u>Counts I and II Are Dismissed</u>

Counts I and II of Hunter's Counterclaims are based on Medeiros' clandestine recordings of an October 12, 2012 Step III grievance hearing that was attended by Westerman, County DHR head Thomas Takatsuki, Union Agent Dale

Shimomura, and KFD employee Rose Bettencourt.  Hunter Counterclaim at 15-16.

Ragasa did not attend this hearing.  Medeiros used a recording application on his

smartphone to digitally record the hearing without the consent or knowledge of the

other attendees and allowed the device to continue to record even after he exited

the hearing.  *Id.* at 16.  Following the hearing, Medeiros gave Ragasa a copy of the

recording.  *Id.* at 17.  Ragasa disclosed the contents of this and other recordings to

Hunter, Westerman, Vierra and the County in response to discovery requests in

this lawsuit.  *Id.*

Count I alleges a violation of federal law, while Count II alleges a state law

violation.  For purposes of Counts I and II, the Court finds that Hunter was not the

"person whose wire, oral, or electronic communication is intercepted, disclosed, or

intentionally used."  18 U.S.C. § 2520(a); *see also* HRS § 803-48 ("…person

whose wire, oral, or electronic communication is accessed, intercepted, disclosed,

or used").  In fact, it is undisputed that Hunter was not at the October 12, 2012

grievance hearing, was not recorded by Medeiros, and therefore cannot be a

"person" whose communication was disclosed within the meaning of the relevant

statutes.

Hunter's argument that local union organizations are sufficient to qualify as

associations under the section 2510(6) definition of "person" is unavailing.  *See*

Hunter Mem. in Opp. at 7-11.  The case he relies upon, *Smoot v. United Transp. Union,* 246 F.3d 633 (6th Cir. 2001), involved communications claims brought by a company whose designated representative was secretly recorded at an executive session.  246 F.3d at 636.  That is not the case here.  Whereas the counterclaimant in *Smoot* had standing to bring its counterclaim as a corporation whose Senior Director of Employee Relations was improperly recorded, Hunter in his individual capacity, has no analogous relationship with any of the parties allegedly recorded at the October 12, 2012 grievance hearing.  *See* 246 F.3d at 639-40.  *Smoot* is inapplicable.

Nor is the Court persuaded by Hunter's unsupported claim that a union or group of co-conspirators may have standing because it is an "association" with a "possessory interest."  To the extent Hunter relies upon Ragasa's allegations of a conspiracy between the individual capacity Defendants to retaliate against him, the Court is not convinced that there is any tenable "association" that plausibly brings Hunter within the definition of the statutes.  He points to no precedential authority on this issue, and without firmer guidance, the Court will not contort the definition of "person" in the manner suggested by Hunter.

Accordingly, Counts I and II of Hunter's Counterclaim are DISMISSED.

## B.   <u>Counts III Through XII Remain</u>

Hunter's remaining Counterclaims do not suffer from the same defect—

Hunter is recorded on all of the intercepted and disclosed communications alleged

in Counts III through XII.  Ragasa nonetheless moves to dismiss Counts III

through XII on the grounds that the allegations are conclusory and do not state

plausible claims for violation of the federal and state statutes.  The Court disagrees.

Hunter alleges that his communications were intercepted for the purpose of

committing extortion and pleads facts that plausibly give rise to such liability.

Hunter's Counterclaim alleges, for example, that during his January 24, 2013

telephone conversation with Ragasa:

> Ragasa made the following statements to and requests of
> Hunter:  1) that Hunter needed to draft a form and/or a letter for
> Ragasa's attorney in support of Ragasa's claims of retaliation;
> and 2) that Ragasa was taping phone calls [and] possessed [a]
> letter which incriminated Hunter.
>      …
> Ragasa made the following threats to Hunter:  1) that Ragasa
> would disclose the incriminating letters and recorded phone
> calls if Hunter did not comply with Ragasa's requests; and 2)
> that Ragasa would cause Hunter to lose his job by disclosing
> the letters and recordings.
>      …
> After making his requests and demands during the phone and
> oral conversations with Hunter on January 24, 2013 and March
> 12, 2013, Ragasa made good on his threats and took a
> substantial step toward completing the conspiracy to extort
> Hunter.  Ragasa took this substantial step by disclosing all of
> the above-mentioned recordings from Medeiros, Jacquias, and

> Ragasa, which had a threatened and actual, detrimental effect
> on Hunter's employment and personal reputation.

Hunter Counterclaim at 22-23, ¶¶ 5, 6, 13.  Hunter sufficiently pleads facts, rather than mere conclusions, that if proved, would establish that Hunter's communications were recorded with extortion in mind.  18 U.S.C. § 2511(2)(d); HRS § 803-42(b)(3)(A).

To the extent Ragasa relies upon defenses such as one-party consent to the recordings—either his own consent, or that of Medeiros or Jacquias—or pursuant to HRS § 707-769, he may raise such defenses in his Answer.  Such fact-sensitive affirmative defenses are not grounds to grant a Rule 12(b)(6) motion in this instance.  *See Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) ("[T]he assertion of an affirmative defense may be considered properly on a motion to dismiss where the 'allegations in the complaint suffice to establish' the defense.") (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)); *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (per curiam) ("If, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper."); 5B Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1357 (3d ed. 1998) ("[A] dismissal under Rule 12(b)(6) is likely to be granted by the district court only in

the relatively unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to securing relief.").

Here, the factual allegations of the Counterclaim surpass the speculative level, pleading factual content beyond labels and conclusions. *See Twombly*, 550 U.S. at 555. Hunter's Counterclaims have facial plausibility, pleading factual content that allows the Court to draw the reasonable inference that Ragasa is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 677. As a result, Ragasa's motion is DENIED with respect to Counts III through XII.

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendants' motions for summary judgment. The individual capacity Defendants' motions are DENIED with respect to Count I and GRANTED with respect to Count IV. Dkt. Nos. 105, 108, and 112. The County's motion is GRANTED with respect to Count II, DENIED with respect to Count III, and GRANTED in part as to Count V. Dkt. No. 115.

Ragasa's motion to dismiss Hunter's Counterclaims is GRANTED in part as to Counts I and II and DENIED as to the remaining Counts III through XII.  Dkt. No. 118.

IT IS SO ORDERED.

DATED: February 8, 2016 at Honolulu, Hawai'i.

_____
Derrick K. Watson
United States District Judge

-------------------------------------------------------------------------------------------------

_Carl A. Ragasa v. County of Kaua'i, et al.;_ Civil No. 14-00309 DKW-BMK;
**ORDER GRANTING IN PART AND DENYING IN PART: (1) ROBERT F. WESTERMAN'S, IN HIS INDIVIDUAL CAPACITY, MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]; (2) KALANI VIERRA'S, IN HIS INDIVIDUAL CAPACITY, MOTION FOR SUMMARY JUDGMENT [DKT. NO. 108]; (3) NORMAN HUNTER'S, IN HIS INDIVIDUAL CAPACITY, MOTION FOR SUMMARY JUDGMENT [DKT. NO. 112]; (4) COUNTY OF KAUAI'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 115]; AND (5) CARL A. RAGASA'S FRCP 12(B)(6) MOTION TO DISMISS NORMAN HUNTER'S COUNTERCLAIM FILED OCTOBER 12, 2015 [DKT. NO. 118]**